IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MARVIN M. MOORE,                           )
     Plaintiff,                           )
                              )
                                )
          v.                           )     Civil No. 3:17cv420 (REP)
                                )
NANCY A. BERRYHILL,                        )
Acting Commissioner of Social Security,    )
     Defendant.                           )
_____  )

## REPORT AND RECOMMENDATION

On September 30, 2015, Marvin M. Moore ("Plaintiff") applied for Supplemental

Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from post-

traumatic stress disorder ("PTSD"), a learning disability, bipolar disorder and attention deficit

hyperactivity disorder ("ADHD"), with an alleged onset date of January 10, 2015. The Social

Security Administration ("SSA") denied Plaintiff's claims both initially and upon

reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a

written decision and the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in failing to address favorable evidence in the record and in failing to

properly weigh the opinions of the state agency medical consultants. (Mem. in Support of Pl.'s

Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 8) at 4-11.) This matter now comes before the

Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties'

cross-motions for summary judgment, rendering the matter ripe for review.[1]  For the reasons that

follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be

DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and

that the final decision of the Commissioner be AFFIRMED.

## I.      PROCEDURAL HISTORY

On September 30, 2015, Plaintiff filed an application for SSI with an alleged onset date

of January 10, 2015. (R. at 73, 87.)  The SSA denied these claims initially on February 22, 2016,

and again upon reconsideration on August 17, 2016. (R. at 73-86, 88-100.)  At Plaintiff's written

request, the ALJ held a hearing on January 12, 2017. (R. at 33-71.)  On January 25, 2017, the

ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not

qualify as disabled under the Act, because Plaintiff could perform jobs that exist in the national

economy. (R. at 18-28.)  On May 15, 2017, the Appeals Council denied Plaintiff's request for

review, rendering the ALJ's decision as the final decision of the Commissioner subject to review

by this Court. (R. at 1-3.)

## II.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 416.920(a)(4)(i). At step two, the

ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite his physical and mental limitations. § 416.945(a). At step four, the ALJ assesses whether the claimant can perform his past relevant work given his RFC. § 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 416.920(a)(4)(v).

### III.   THE ALJ'S DECISION

On January 12, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 33-71.) On January 25, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 18-28.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 19-28.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date, September 30, 2015. (R. at 20.) At step two, the ALJ determined that Plaintiff had the following severe impairments: anti-social personality disorder; mild bipolar disorder with mixed features; and, ADHD. (R. at 20-21.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-23.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with certain non-exertional limitations. (R. at 23-27.) Specifically,

4

Plaintiff could understand, remember and follow unskilled simple, routine, repetitive tasks that he learned through demonstration, not from reading. (R. at 23.) He could maintain concentration, persistence or pace for two hours at a time with normal breaks, and he could perform tasks that did not require stringent production or a fast pace. (R. at 23.) Plaintiff could interact with others in work settings in which his work primarily involved working with things instead of people. (R. at 23.) Finally, Plaintiff could adapt to occasional simple changes associated with his unskilled work. (R. at 23.) At step four, the ALJ found that Plaintiff had no past relevant work. (R. at 27.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including work as a dishwasher, machine presser or sorter. (R. at 27-28.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 28.)

## IV.    ANALYSIS

Plaintiff, thirty-five years old at the time of this Report and Recommendation, previously worked in restaurants as a cook and cleaner. (R. at 39, 42, 169, 178-80, 200-01.) He applied for Social Security Benefits, alleging disability from PTSD, a learning disability, bipolar disorder and ADHD with an alleged onset date of January 10, 2015. (R. at 73, 199.) Plaintiff's appeal to this Court alleges that the ALJ failed to (1) address favorable evidence in the record and (2) properly weigh the opinions of the state agency medical consultants. (Pl.'s Mem. at 4-11.) For the reasons set forth below, the ALJ did not err in her decision.

### A. The ALJ Adequately Considered and Addressed the Evidence of Record.

Plaintiff argues that the ALJ erred in failing to address evidence in the record that favors Plaintiff's claim. (Pl.'s Mem. at 4-10.) First, Plaintiff alleges that the ALJ failed to address his limitations interacting with supervisors. (Pl.'s Mem. at 5-7.) Second, according to Plaintiff, the

5

ALJ failed to address certain moderate and marked limitations found in the state agency opinions. (Pl.'s Mem. at 7-10.) Defendant responds that the ALJ did not need to address every single piece of evidence in the record. (Def.'s Mot. for Summ. J. and Br. in Support Thereof ("Def.'s Mem.") (ECF No. 12) at 14.) Moreover, Defendant argues that the ALJ sufficiently discussed Plaintiff's difficulty getting along with others throughout her decision. (Def.'s Mem. at 14.) Lastly, Defendant avers that the ALJ considered the state agency opinions in full and adequately explained the RFC assessment. (Def.'s Mem. at 15-17.)

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. § 416.945(b)-(d). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making her RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. § 416.945(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis in the claimant's credible complaints. § 416.945(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each

conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations.

### 1. Plaintiff's Difficulties Interacting with Supervisors.

The ALJ sufficiently discussed Plaintiff's limitations interacting with supervisors. At step three of the sequential analysis, the ALJ found that Plaintiff had moderate limitations interacting with others. (R. at 22.) In making this determination, the ALJ discussed specific evidence from the record. For example, the ALJ noted that in February 2016, Plaintiff stated that he preferred not to work around many people. (R. at 22.) The ALJ acknowledged that the psychological examiner, Karen L. Russell, Psy.D., had opined that Plaintiff would benefit from "little to no personal interaction due to his anti-social personality disorder." (R. at 22.) Nonetheless, the ALJ also noted that treatment notes in the record revealed Plaintiff's normal and cooperative attitude. (R. at 22.) Plaintiff had lived on a friend's couch, and later with his aunt without incident, and he had a girlfriend. (R. at 22.) He frequently walked in public and took public transportation. (R. at 22.) The ALJ found that, given these circumstances, Plaintiff had no more than a moderate degree of limitation interacting with others. (R. at 22.)

The ALJ also considered and reviewed Plaintiff's difficulties interacting with supervisors in the RFC and its accompanying explanation. The ALJ precluded Plaintiff from any work that required stringent production or a fast pace. (R. at 23.) The ALJ also limited Plaintiff's interaction with others in the workplace by restricting him to work "primarily with things not people." (R. at 23.)

Explaining the RFC, the ALJ again discussed evidence in the record of Plaintiff's struggle to get along with others. The ALJ acknowledged Plaintiff's testimony that he could not work primarily due to his "anger issues and mood swings, which ma[de] it difficult for him to

7

interact with others." (R. at 24.)  The ALJ noted the relatively normal mental status evaluations in the record, but also the mood swings, sad affect and depression that Plaintiff experienced.  (R. at 25.)  The ALJ noted that in March 2016, Plaintiff felt irritable and did not want to be around others, and that in April 2016, he got into a fight with a relative.  (R. at 25.)  However, the ALJ recognized that Plaintiff's mental examinations and medications remained unchanged throughout this time period.  (R. at 25.)

Once again, the ALJ discussed Dr. Russell's opinion.  (R. at 25-26.)  Affording the opinion great weight, the ALJ explained that Plaintiff's treatment notes — like Dr. Russell's opinion — demonstrated his irritability around other people but his otherwise normal mental status examinations.  (R. at 26.)  Likewise, the ALJ considered the opinions of the state agency medical consultants that Plaintiff had marked limitations interacting with others.  (R. at 26.)  The ALJ afforded these opinions only some weight because, in part, Plaintiff's treatment notes indicated only moderate mental limitations.  (R. at 26.)  Michael Sullivan, P.M.H.N.P., opined that Plaintiff could not work or remained severely limited in his "capacity for self-support" due to his difficulties interacting with people.  (R. at 26, 642.)  The ALJ afforded Mr. Sullivan's opinion little weight, because he did not qualify as an acceptable medical source and the record did not support work-preclusive social limitations.  (R. at 26.)

Substantial evidence in the record supports the ALJ's discussion of and conclusions regarding Plaintiff's ability to interact with others.  In 2015 — the year during which Plaintiff filed his application and alleged that his disability began — Plaintiff remained incarcerated at the Richmond City Jail until September 8, 2015.  (R. at 87-88, 340, 517.)  He sought no mental health treatment in 2015, despite frequently requesting inhalers and complaining about his diet and various pains.  (R. at 318-30.)  When Plaintiff underwent mental examination earlier in his

8

incarceration, medical staff consistently recorded normal findings, including: appropriate mood, affect, speech and behavior; neat appearance; and, logical thought process. (R. at 341, 360-61, 369, 394, 472, 489, 497, 503.) On multiple occasions, Plaintiff refused evaluation and/or treatment. (R. at 352-53, 371-73, 543-44.) For example, on June 26, 2014, staff described Plaintiff as "very agitated" and in need of mental health treatment, but he refused to receive a tuberculosis shot or cooperate for a medical intake evaluation. (R. at 363, 414-16.) The next day, however, Plaintiff cooperated with the treatment provider — denying any current mental health issues or past treatment — who noted an entirely normal mental status examination. (R. at 369.) By June 30, 2014, Plaintiff returned to general population. (R. at 361.)

Upon release, Plaintiff began post-incarceration services with OAR of Richmond ("OAR"). (R. at 633-41.) On September 16, 2015, Plaintiff's case manager noted that he showed motivation to find employment and housing, as well as interest in taking a computer class. (R. at 633.) On October 7, 2015, Plaintiff told his case manager that he became angry when he tried to read or write, and the case manager described him as "functionally illiterate." (R. at 635.) On October 23, 2015, Plaintiff appeared reserved at first, but he eventually stated that he had made several friends and started to build a "network." (R. at 637.)

In November 2015, Plaintiff continued to look for work to no avail, but he claimed to have "some irons in the fire." (R. at 638.) He continued to attend computer classes. (R. at 638.) In December 2015, Plaintiff missed some appointments at OAR, but he continued his job search. (R. at 639.) On January 15, 2016, the case manager noted that Plaintiff would no longer receive free bus passes to look for work. (R. at 640.) The case manager noted that OAR had provided bus passes to Plaintiff since September 2015, but Plaintiff had not secured a job, he misrepresented his criminal record on job applications, and the case manager suspected that

9

Plaintiff sold his food stamps for money. (R. at 640.) Throughout his reentry services with OAR — which often focused on his job search — Plaintiff never expressed concern about his ability to interact with others, let alone supervisors. (R. at 633-41.)

In conjunction with the services that he received from OAR, Plaintiff also began treatment at the Daily Planet HC for the Homeless (the "Daily Planet"). On October 21, 2015, Plaintiff presented to the Daily Planet for an initial psychiatric evaluation. (R. at 613.) As he recounted dropping out of school after the ninth grade, and multiple incarcerations since, Plaintiff explained that he had problems with "attitude and authority figures." (R. at 613.) Upon mental examination, Plaintiff displayed concrete thoughts, fair judgment, fair insight and no suicidal or homicidal ideations. (R. at 613.) On November 18, 2015, Plaintiff stated that his stressors included poor social contacts, family issues and homelessness. (R. at 611.) Yet, the examiner's mental findings remained unremarkable. (R. at 611.) Plaintiff exhibited a depressed mood but good eye contact and a cooperative attitude. (R. at 611.)

Over the next several months, Plaintiff's condition and treatment remained consistent. On December 16, 2015, Plaintiff complained to Mr. Sullivan about increased stress. (R. at 608.) However, Plaintiff lived with a friend, and medication had improved his sleep. (R. at 608.) On January 13 and February 10, 2016, Plaintiff remained the same, and his mental examinations yielded the same results as they had in December 2015. (R. at 604, 606, 608.)

On March 9, 2016, Plaintiff reported that he experienced mood swings, ruminated on "bad things" and sometimes did not "want to be around people." (R. at 602.) Upon mental examination, Mr. Sullivan found Plaintiff generally healthy with a normal, cooperative attitude, despite avoiding eye contact. (R. at 602.) By his next visit on April 6, 2016, Plaintiff felt less irritable, and his sleep had improved. (R. at 600.) He had recently fought with a relative, but his

mental status remained unchanged. (R. at 600, 602.) On May 4, 2016, Plaintiff reported a slightly improved mood, better sleep and improvements in his family life. (R. at 598.) Mr. Sullivan described Plaintiff as healthy and neatly groomed, with a cooperative attitude and fair eye contact. (R. at 598.) On June 1, 2016, Plaintiff felt happy, despite some continuing stress and depression. (R. at 596.) He had started sleeping during the day, because he played video games until 4:00 a.m. (R. at 596.) His mental status remained unchanged. (R. at 596, 598.)

Plaintiff's final three appointments at Daily Planet continued in a similar fashion. On June 29, 2016, Plaintiff became defensive when Mr. Sullivan mentioned a free reading program to improve his literacy. (R. at 643.) Plaintiff complained that he could not focus around other people. (R. at 643.) Still, he felt happy, because he had a new girlfriend. (R. at 643.) Mr. Sullivan's mental status findings remained the same, and he refilled Plaintiff's prescriptions. (R. at 596, 643.) One month later, Plaintiff felt "okay" on his medications, despite losing his girlfriend and previous living arrangement. (R. at 645.) During his last appointment on September 23, 2016, Plaintiff informed Mr. Sullivan that he planned to move to Virginia Beach in October to care for his aunt. (R. at 647.) Plaintiff's mental status had not changed over his last five appointments — he repeatedly dressed neatly, had fair eye contact and displayed a normal, cooperative attitude. (R. at 596, 598, 643, 645, 647.)

These treatment records demonstrate that Plaintiff regularly complained about interacting with people, but he also lived with and got along with others. (R. at 598, 600, 602, 604, 608, 611, 613, 643, 645, 647.) Plaintiff did not work at the time, so naturally these records lack evidence of difficult interactions with supervisors. (R. at 598, 600, 602, 608, 611, 613, 643, 645, 647.) Indeed, the record as a whole contains little evidence of Plaintiff's claimed trouble with supervisors.

11

The opinion evidence also supports the ALJ's decision regarding Plaintiff's interaction with supervisors. Mr. Sullivan treated Plaintiff more than any other provider in the record, and he opined simply that Plaintiff had employment restrictions due to his "[d]ifficulty interacting with people" — without mention of supervisors or further explanation. (R. at 642.) The ALJ afforded Mr. Sullivan's opinion little weight, but this opinion still showed no special concern about Plaintiff's interaction with supervisors. (R. at 21, 642.)

Dr. Russell's opinion provides more insight. Dr. Russell examined Plaintiff on February 11, 2016, and she noted that Plaintiff first appeared suspicious of the questions that she posed to him. (R. at 566, 568.) However, he "relax[ed] considerably" as the examination continued. (R. at 568.) Dr. Russell noted Plaintiff's problems with authority figures in several contexts: in school before he dropped out; with legal authorities as a juvenile and an adult; and, during his "very brief" work history. (R. at 566-68, 570.) Regarding work specifically, Plaintiff explained that he did not like others correcting him or giving him orders. (R. at 567.) Plaintiff also stated that he would not respond well to hearing that he needed to work faster. (R. at 568.) Thus, Plaintiff indicated that he wanted to work but not around many people. (R. at 568.)

Dr. Russell opined that Plaintiff met the criteria for anti-social personality disorder, in part, because of his reports of consistent trouble with authority figures. (R. at 570.) She noted Plaintiff's "sense of entitlement" that "no one should . . . tell[] him what to do." (R. at 570.) Consequently, Dr. Russell opined that Plaintiff would have no difficulty executing simple commands and rote tasks without supervision. (R. at 570.) Moreover, Dr. Russell indicated that Plaintiff would benefit from "little to no personal interaction in the workplace." (R. at 570.)

The ALJ afforded great weight to Dr. Russell's opinion, and the ALJ's decision reflects that weight. (R. at 26.) The ALJ found Dr. Russell's opinion consistent with the treatment

records that revealed Plaintiff's "irritability around other people." (R. at 26.) This discussion

did not exclude Plaintiff's difficulties with supervisors simply because it did not single out

Plaintiff's aversion to authority. Moreover, in the RFC itself, the ALJ limited Plaintiff to interact

with others only in settings where he worked primarily with things, not people. (R. at 23.)

Plaintiff's own statements further support the ALJ's decision. As stated above, Plaintiff

explained to Dr. Russell that he did not want to work around many people or under pressure from

others to work faster. (R. at 568.) On appeal, Plaintiff highlights his testimony that he allegedly

lost five jobs in a row due to disagreements with his managers. (Pl.'s Mem. at 6.) Indeed,

Plaintiff testified that he last worked at McDonald's, and his manager fired him after they had an

argument and Plaintiff "got too disrespectful." (R. at 58.) Plaintiff also stated that he quit a

previous job at Taco Bell after another argument. (R. at 58.) However, Plaintiff testified that he

last worked in 2010 — five years before his application and alleged onset date. (R. at 42, 73,

87.) And as of the date of the hearing, Plaintiff continued to apply for jobs, but he cited his lack

of education and his criminal record as the reasons that he could not find work. (R. at 43.)

The ALJ acknowledged that Plaintiff identified his anger issues and mood swings as the

primary reasons that Plaintiff believed that he could not work. (R. at 24, 51.) The ALJ

recognized that these conditions "ma[d]e it difficult for him to interact with others." (R. at 24.)

However, the ALJ also noted that Plaintiff testified that he took public transportation, walked in

public, ate at homeless shelters and spent regular time with family — all activities that involve

interacting with other people. (R. at 24.) Indeed, Plaintiff testified that he traveled between

Richmond and Virginia Beach by either Greyhound bus or by getting a ride from his uncle. (R.

at 45.) He relied on family, friends and homeless shelters for basics like coffee in the morning

and food. (R. at 44.) Plaintiff walked around daily to bum cigarettes and find other things that

13

he wanted. (R. at 44.) Plaintiff's aunt offered him shelter in exchange for care, and he accepted. (R. at 44-45.) He took the trash out for his aunt and kept her company, telling old family stories. (R. at 45.) While Plaintiff's statements indicated that he had argued with managers in the past, his testimony also demonstrated that he navigated dealing with other people daily.

Plaintiff argues that the ALJ ignored the opinions of the state agency medical consultants that Plaintiff had moderate limitations interacting with supervisors. (Pl.'s Mem. at 5-6.) According to Plaintiff, his own testimony during the hearing corroborated this moderate limitation and warranted attention from the ALJ. (Pl.'s Mem. at 6-7.) Upon review of the record, the state agency opinions about Plaintiff's interaction with supervisors comport with the RFC ultimately fashioned by the ALJ.

The Fourth Circuit has recognized that "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.'" *Woodbury v. Colvin*, 213 F. Supp. 3d 773, 778 (D.S.C. 2016) (quoting *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005))). Instead, when "[t]he Commissioner, through the ALJ and Appeals Council, [has] stated that the whole record was considered, . . . absent evidence to the contrary, we take her at her word." *Reid*, 769 F.3d at 865 (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)). In *Reid*, the plaintiff argued that the ALJ failed to mention objective findings that supported his claim. *Id.* The Fourth Circuit rejected this argument, finding that the ALJ considered the entire record, discussed treatment notes from the disputed time period, and that the plaintiff had "failed to point to *any* specific piece of evidence . . . that might have changed the outcome of his disability claim." *Id.* Where the ALJ "sufficiently bridges [her] conclusions with the evidence in dispute," failure to

address that particular evidence does not warrant remand. *Woodbury*, 213 F. Supp. 3d at 779 (internal quotation marks and additional citation omitted).

On February 22, 2016, Alan D. Entin, Ph.D., considered Plaintiff's claim at the initial stage. (R. at 73-84.)  Dr. Entin reviewed the record as of that date, and drew conclusions about Plaintiff's mental limitations. (R. at 74-84.)  The evidence that Dr. Entin reviewed included Dr. Russell's opinion, which Dr. Entin gave great weight. (R. at 82.)  In the area of social interaction limitations, Dr. Entin offered opinions on five sub-sections of social functioning. (R. at 84.)  Among those sub-sections, Dr. Entin opined that Plaintiff had moderate limitations in his "ability to accept instructions and respond appropriately to criticism from supervisors." (R. at 84.)  Explaining the social interaction limitations that he found, Dr. Entin borrowed directly from Dr. Russell, opining that Plaintiff "would likely benefit from little to no personal interactions with the general public.  He would contaminate interpersonal interactions if he had to interact with the general public." (R. at 84, 570.)  Thus, even Dr. Entin's explanation focused more on Plaintiff's social interaction limitations generally, as opposed to his ability to interact with supervisors.

On August 17, 2016, Richard Luck, Ph.D., considered Plaintiff's claim upon reconsideration. (R. at 88-98.)  Dr. Luck reviewed the same evidence as Dr. Entin, as well as additional medical records that the Agency had received in the interim. (R. at 89-93.)  Like Dr. Entin, Dr. Luck gave great weight to Dr. Russell's opinion, and he opined that Plaintiff had moderate limitations accepting instructions from supervisors and responding appropriately to criticism. (R. at 96, 98.)  Like Dr. Entin, Dr. Luck also quoted Dr. Russell in explaining Plaintiff's social limitations. (R. at 98, 570.)  Dr. Luck stated simply that Plaintiff "would likely benefit from little personal interactions with the general public." (R. at 98, 570.)

The ALJ afforded the state agency opinions "some weight," crediting Drs. Entin and Luck as mental health specialists and doctors familiar with the regulations and standards of the Act. (R. at 26.) Both state agency medical consultants found that Plaintiff had moderate mental limitations, which included interaction with supervisors. (R. at 84, 98.) The ALJ agreed with that finding, noting that Plaintiff's "treatment notes suggest he has *moderate mental health limitations* due to his mood swings . . . but generally normal mental status examinations." (R. at 26 (emphasis added).) The ALJ had no obligation to dissect the state agency opinions line-by-line and address each individual limitation. *Reid*, 769 F.3d at 865. Instead, the ALJ discussed Plaintiff's difficulties with social interaction throughout her opinion. (R. at 22-27.) Importantly, as stated above, the ALJ incorporated Plaintiff's social limitations into the RFC by restricting Plaintiff to working "primarily with things[,] not people" and to tasks that do not require "stringent production or fast pace." (R. at 23.)

Additionally, the Commissioner — through the ALJ — stated that she considered the entire record, and the Court takes her at her word. (R. at 20); *Reid*, 769 F.3d at 865. As explained above, the ALJ's decision makes clear that she thoroughly considered Plaintiff's difficulties interacting with others. (R. at 22, 24-27.) In doing so, the ALJ discussed Plaintiff's subjective statements, the treatment notes and objective medical evidence, the medical opinions of Plaintiff's treatment providers and the opinions of the state agency medical consultants. (R. at 22-27.) From the record evidence, the ALJ concluded that Plaintiff's "social interaction difficulties [remained] present, . . . [but he could] generally . . . function in public places on a daily basis without substantial issues." (R. at 27.) And in the RFC, the ALJ restricted Plaintiff to tasks that primarily involve working with things instead of people. (R. at 23.) The ALJ's decision sufficiently bridged a connection between her conclusions about Plaintiff's ability to

interact with others and the specific evidence that Plaintiff highlights on appeal. The fact that the ALJ did not explicitly address Plaintiff's moderate limitation interacting with supervisors does not warrant remand.

In sum, the ALJ adequately considered, discussed and accounted for Plaintiff's moderate limitations interacting with others. This assessment encompassed and accounted for Plaintiff's difficulty with supervisors. Substantial evidence in the record — in the form of treatment notes, medical opinions and Plaintiff's own statements — supports the ALJ's decision.

### 2.  Plaintiff's Moderate and Marked Limitations.

Plaintiff also seeks remand, because the ALJ failed to discuss each and every moderate or marked limitation to which the state agency medical consultants opined. (Pl.'s Mem. at 8-9.) This argument fails for reasons similar to those explained above.

First, Plaintiff concedes that the ALJ adopted four moderate limitations from the state agency opinions. (Pl.'s Mem. at 8 n.4.) Indeed at step three — when analyzing whether Plaintiff satisfied one of the medical listings — the ALJ found that Plaintiff had moderate limitation in the following areas: understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and, adapting or managing himself. (R. at 22-23.) Explaining Plaintiff's limitation interacting with others, the ALJ recounted Plaintiff's agitated behavior for a brief period during his incarceration and his desire not to work around people, as well as the fact that Plaintiff lived with a friend, had a girlfriend and displayed a normal mood and attitude on examination. (R. at 22.) The ALJ also noted that Plaintiff often walked in public and moved in with his aunt without incident. (R. at 22.)

These findings encompassed more of the state agency opinions than Plaintiff concedes. For example, the regulations explain that the ability to "interact with others" encompasses "the

abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404 Subpt. P, App'x 1. Examples of interacting with others include: cooperating with others; asking for help when needed; handling conflicts with others; responding to criticism; and, "keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.* Thus, in finding and explaining moderate limitations in Plaintiff's ability to interact with others, the ALJ adequately addressed five of the nine limitations from Drs. Entin and Luck's opinions (social functioning; working in proximity to/coordination with others without distraction; interacting appropriately with the general public; accepting instructions/criticism from supervisors; and, getting along with co-workers/peers) that Plaintiff argues on appeal. (R. at 22, 81, 83-84, 95, 97-98.)

With the ability to "[a]dapt or manage oneself," the regulations refer to one's "abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Pt. 404 Subpt. P, App'x 1. Examples include: responding to demands; adapting to changes; distinguishing between acceptable and unacceptable work performance; and, maintaining personal hygiene and attire. *Id.* Thus, in finding moderate limitation in Plaintiff's ability to adapt and manage himself, the ALJ accounted for Dr. Entin's and Dr. Luck's opinions that Plaintiff remained moderately limited in his ability to maintain socially appropriate behavior and maintain basic standards of neatness and cleanliness. (R. at 22-23, 84, 98.)

Under the regulations, concentration, persistence or pace encompass the ability to "focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404 Subpt. P, App'x 1. Examples include: completing tasks on time; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and, working a full day without more than the allotted number/length of rest periods. *Id.* Thus,

in finding moderate limitations in this area, the ALJ addressed two of the moderate limitations in Dr. Entin's opinion (maintaining concentration, persistence or pace and maintaining attention and concentration for extended periods) and three of the moderate limitations in Dr. Luck's opinion (the same two as from Dr. Entin's opinion, as well as completing a normal workday/week without psychologically-based interruptions and performing at a consistent pace without unreasonably long or numerous rest periods).  (R. at 22, 83, 97.)  The ALJ also incorporated these limitations in the RFC by finding that Plaintiff could maintain concentration, persistence or pace for two hours at a time with normal breaks.  (R. at 23.)  Thus, the ALJ addressed all of the limitations that Plaintiff claims that the ALJ ignored from Dr. Luck's opinion.  (Pl.'s Mem. at 8-9.)

One limitation from Dr. Entin's opinion remains — Plaintiff's moderate restriction with activities of daily living.  (Pl.'s Mem. at 8.)  But the ALJ addressed this limitation at step three and in her RFC assessment.  (R. at 21-27.)  Among other things, activities of daily living include: doing household chores, taking public transportation and paying bills. 20 C.F.R. Pt. 404 Subpt. P, App'x 1.  At step three, the ALJ acknowledged Dr. Russell's opinion that Plaintiff could independently manage his own finances.  (R. at 22.)  The ALJ also noted that Plaintiff cared for his aunt and took public transportation.  (R. at 22-23.)  In her explanation of the RFC, the ALJ again discussed these activities, explaining that Plaintiff did not drive, but he took out the trash for his aunt and spent time talking with her.  (R. at 24.)  Thus, the ALJ adequately addressed Plaintiff's limitation with activities of daily living.

Finally, while the ALJ's decision as discussed above would suffice, the ALJ went further regarding the marked limitations to which Dr. Entin alone opined.  Dr. Entin opined that Plaintiff had marked limitations (1) maintaining social functioning, (2) working in coordination

19

with/proximity to others without distraction and (3) interacting appropriately with the public. (R. at 81, 83-84.) The ALJ afforded Dr. Entin's opinion some weight, agreeing that the treatment notes suggested moderate mental health limitations from mood swings and distractibility but generally normal mental status examinations. (R. at 26.) However, the ALJ continued, the record evidence did "not establish marked social interaction difficulties." (R. at 26.) Each of Dr. Entin's suggested marked limitations relates to social interaction. (R. at 81, 83-84.) Thus, the ALJ undoubtedly considered these portions of Dr. Entin's opinion, but found them inconsistent with the record as a whole. And as detailed above, the treatment notes in the record reflect generally normal mental examinations. Thus, the ALJ did not err.

It bears repeating that the ALJ indicated that she reviewed the entire record, and the Court takes her at her word. (R. at 20); *Reid*, 769 F.3d at 865. But even so, the ALJ adequately addressed the moderate and marked limitations found within Dr. Entin and Dr. Luck's opinions. The Court finds no reason to remand simply because the ALJ did not enumerate every single limitation to which the state agency medical consultants opined.

## B. The ALJ Appropriately Weighed the State Agency Medical Opinions.

Finally, Plaintiff argues that the ALJ erred by affording a "vague and imprecise" amount of weight to the opinions of the state agency medical consultants. (Pl.'s Mem. at 10.) Citing a previous decision by this Court that recommended remand based on an assignment of "appropriate weight," Plaintiff claims that the assignment of "some weight" here likewise requires reversal. (Pl.'s Mem. at 11.) Defendant responds that ALJs commonly use "some weight" — in addition to other terms like "little weight" and "significant weight" — when weighing medical opinions. (Def.'s Mem. at 17-18.)

Plaintiff relies on a decision of this Court, *Chirico v. Astrue*, 2011 WL 6371315 (E.D. Va. Nov. 21, 2011), *report and recommendation adopted*, 2011 WL 6396586 (E.D. Va. Dec. 20, 2011), to challenge the weight that the ALJ gave the state agency opinions. (Pl.'s Mem. at 11.) In *Chirico*, the Court recognized that when an ALJ evaluates a medical opinion "[s]he is required to 'explain . . . the weight given' thereto and 'give good reasons . . . for the weight.'" 2011 WL 6371315, at *5 (quoting *Day v. Astrue*, 2010 WL 2735702, at *5 (E.D. Va. June 16, 2010) (quoting 20 C.F.R. §§ 416.927(d)(2), 416.927(f)(2)(ii))). But *Chirico* stands inapposite to the case at bar. There, the plaintiff challenged the ALJ's assignment of "appropriate weight" to the opinion of his treating psychologist. *Chirico*, 2011 WL 6371315, at *4. The Court found the designation of "appropriate weight . . . too vague to enable th[e] [C]ourt to determine whether the ALJ's decision was supported by substantial evidence." *Id.* at *5. More specifically, the Court found that the term "appropriate weight" failed to "sufficiently define the weight being given." *Id.*

Unlike the ALJ in *Chirico*, the ALJ here afforded the state agency opinions "some weight." (R. at 26.) This designation is not so vague and undefined that the Court cannot understand the weight afforded. Indeed, the ALJ's evaluation of the other medical opinions in the record sheds light on the matter. The ALJ afforded Dr. Russell's opinion "great weight," and explained that (1) Dr. Russell specialized in mental health; (2) she examined and interviewed Plaintiff; and, (3) her opinion and diagnoses remained consistent with treatment notes in the record. (R. at 26.) Conversely, the ALJ afforded Mr. Sullivan's opinion "little weight," because he did not qualify as an acceptable medical source under the regulations. (R. at 26.)

The state agency opinions landed in the middle. The ALJ afforded these opinions something more than little weight but less than great weight — "some weight." (R. at 26.) The

ALJ's explanation confirms as much.  In support of the state agency medical consultants, the ALJ acknowledged that they both specialized in mental health and had familiarity with the regulations and standards of the Act.  (R. at 26.)  Additionally, the ALJ noted that the state agency opinions comported with evidence in the record of Plaintiff's moderate mental health limitations caused by his mood swings and distractibility, despite his generally normal mental examinations.  (R. at 26.)  Nonetheless, neither Dr. Entin nor Dr. Luck had examined or interviewed Plaintiff in person.  (R. at 26.)  Further, as discussed above, the ALJ found that the record did not support the marked limitations to which Dr. Entin opined.  (R. at 26.)

Consequently, the ALJ did not use a vague designation for the weight that she afforded to the state agency opinions.  She gave the most weight to Dr. Russell's opinion, accompanied by a list of supportive reasons.  She gave the least weight to Mr. Sullivan's opinion, accompanied by reasons that detracted from that opinion.  In between, the ALJ afforded "some weight" to the state agency consultants' opinions, and she fully explained her decision by delineating the factors that supported or conflicted with those opinions.  Moreover, as Defendant notes, courts commonly accept the designation of "some weight" to medical opinions.  (Def.'s Mem. at 17); *see Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir. 2018) (remanding for conclusory explanations, *not* for amount of weight assigned); *Monroe v. Colvin*, 826 F.3d 176, 186, 191 (4th Cir. 2016) (same); *Fox v. Colvin*, 632 F. App'x 750, 753 (4th Cir. 2015) (reversing on unrelated grounds); *Burney v. Berryhill*, 276 F. Supp. 3d 496, 499 (E.D.N.C. Aug. 22, 2017) (remanding for lack of explanation, *not* for amount of weight assigned) *Russell v. Colvin*, 2017 WL 818608, at *3 (W.D. Va. Jan. 31, 2017) (recommending remand on unrelated grounds); *Evans v. Colvin*, 2016 WL 1258491, at *3 (S.D. W. Va. Mar. 30, 2016); *Chinault v. Colvin*, 2015 WL 2256631, at *10-12 (E.D. Va. May 13, 2015); *see also Bird*, 699 F.3d at 343 (recognizing "some weight"

22

afforded to a Veterans Affairs ("VA") disability determination); *Praylow v. Colvin*, 2016 WL 11200706, at *9 (D.S.C. Sept. 7, 2016) (recognizing "some weight" afforded to VA ratings and an Army physical profile). Because the ALJ afforded a cognizable amount of weight to the state agency opinions, and adequately explained her reasoning, she did not err.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                          _____ /s/ _____
                                          David J. Novak
                                          United States Magistrate Judge

Richmond, Virginia
Date:  July 24, 2018